# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JUDITH VELAZQUEZ, et al. ) | |
| ) | |
| Plaintiff ) | |
| ) | Case No. 98 C 3100 |
| v. ) | |
| ) | Judge Joan B. Gottschall |
| BETTY LOREN-MALTESE, et al. ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Judith Velazquez ("Velazquez") sued Betty Loren-Maltese ("Loren-Maltese"), the Town of Cicero ("Town"), William Bacon ("Bacon"), Leonard Rutka ("Rutka"), and the Town of Cicero Board of Fire Police and Public Safety Commissioners ("Board") (collectively "defendants")[1] for retaliation against her for her protected speech in violation of the First Amendment (Count I) and for conspiracy (Count III).[2] Rutka and Bacon moved for summary judgment on both counts, as did the Town in a separate motion.[3] The motions for summary judgment are granted in part and denied in part.

**I.    Summary Judgment Standard**

Summary judgment is granted "if the pleadings, depositions, answers to interrogatories,

---

[1] Velazquez also initially sued individual members of the Board, but those defendants were dismissed on April 3, 2003.

[2] On October 26, 2000, the court granted defendants' motion to dismiss Count II for Due Process violations and Count V for "additional First Amendment retaliation." Count IV for First Amendment retaliation was pled only as to Plaintiff Guadalupe Portillo.

[3] Loren-Maltese orally joined the other defendants' motions for summary judgment. The Board did not move.

1

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A party opposing summary judgment must "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). There is no genuine issue for trial unless there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id.* The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 321 (1986).

In this case, the parties have made deciphering which facts are undisputed somewhat challenging. Although defendants did not file a motion to strike, they have objected to a number of Velazquez's facts as relying on evidence that is inadmissible hearsay.

> [H]earsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial, except that affidavits and depositions, which (especially affidavits) are not generally admissible at trial, are admissible in summary judgment proceedings to establish the truth of what is attested or deposed, provided, of course, that the affiant's or deponent's testimony would be admissible if he were testifying live.

*Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). As detailed more fully below, the court has considered hearsay testimony only when it would be admissible at trial, as the court must on summary judgment.

Additionally, on summary judgment, the parties are required to support their statements of fact or disputes as to those statements with citations to admissible evidence. *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000). As discussed more fully below, the court has not considered facts not supported by the record evidence cited, and has deemed facts admitted where the "dispute" as to the fact is not supported by the evidence cited.

2

## II.     Background[4]

Velazquez worked as a police officer for the Town of Cicero from 1990 to 1997. The Town is a municipal corporation under the laws of the State of Illinois. Loren-Maltese was the Cicero Town President. Bacon worked for the Town as Director of Internal Affairs from October 1997 to September 1998. Rutka worked for the Cicero Police Department from 1974 until 1999. In the fall of 1996, Loren-Maltese appointed Rutka as Director of Internal Affairs, and in April 1997, Rutka became Deputy Superintendent of the Police Department. Merrick Scott Rayle ("Rayle") served as the Town prosecutor.

In 1997, there were primary and general elections for Town President of Cicero. Charles Hernandez ("Hernandez"), a police officer, and Emil Schullo ("Schullo"), a former police superintendent, ran against Loren-Maltese, the incumbent. Velazquez testified that she supported Charles Hernandez ("Hernandez"), a Town Police Lieutenant, in the primary and general elections. She acted as a Democratic precinct captain, signed Hernandez's nominating petition, requested a Democratic primary ballot, and distributed Hernandez literature door-to-door. Loren-Maltese knew that there were three political factions in the Cicero Police Department: one that supported her, one that supported Hernandez, and one that supported Schullo.

In April 1997, Loren-Maltese was re-elected as Town President. Following Loren-Maltese's re-election as Town President, at least 30 Cicero police officers, constituting about one-third of the department, were suspended and had charges filed against them seeking their

---

[4]The narrative that follows is adapted from the parties' Local Rule 56.1 statements. Where the facts are disputed, the court resolves the disputes in Velazquez's favor as the non-movant.

discharge. Hernandez avers that these 30 officers were all either his or Schullo's supporters. Rayle testified that Loren-Maltese was the Town official who decided to lodge charges against every officer who had discharge proceedings initiated against him before the Board.[5] Velazquez testified that she supported Hernandez in the 1997 election for Town President.

On November 6, 1997, the Town filed charges against Velazquez seeking her suspension and termination for violating the Town's residency requirement. The Town argues that, under the Cicero Code of Ordinances, police officers were required to reside in Cicero within six months of their employment.[6] Rutka personally served Velazquez with the charges. Rutka did not conduct a residency investigation as to Velazquez and has no knowledge of how such residency investigations were conducted. Velazquez testified that, when she told Rutka that her suspension was wrong, Rutka replied, "I know. I know, but it's not my idea. It's from Betty."[7]

---

[5]Velazquez states: "While Rayle was representing Loren-Maltese and the Town, every case that was brought before the Board that went to hearing resulted in the officer being discharged." Velazquez's citation to the record does not support this fact. Rayle testified that he could not remember whether the board had ever voted not to discharge an officer and that he did not want to guess. Loren-Maltese also testified that she did not know whether there were any cases where the Board voted not to discharge an officer. Loren-Maltese also testified that she did not know whether any officer who was her political supporter had been brought before the Board on charges seeking dismissal.

[6]"All persons accepting appointment or employment with the town as officers, officials or employees, certified or noncertified, must make their residence and maintain their domicile within the Town of Cicero no later than six (6) months after commencing their employment and shall keep such domicile during the term of their appointment or employment." The Code of Ordinances of the Town of Cicero, Illinois, § 2-123. Velazquez disputes whether this ordinance was enforceable as to her because the collective bargaining agreement required the Town to bargain with the union before adopting a residency requirement. Velazquez argues that the Town has presented no evidence that the Town and the union ever bargained as to the residency requirement that the Town adopted.

[7]Defendants argue that this testimony is inadmissible hearsay, but since Rutka and Loren-Maltese are both defendants in this case, their statements are admissible under Fed. R. Evid. 801(d)(2) as admissions of party-opponents.

4

The evidence upon which the Town relied in claiming that Velaquez violated the residency requirement is largely undisputed. In March 1996, Velazquez completed and signed a Residency Certification Form which stated that she maintained her domicile in Cicero but that she maintained her residence in Berwyn. Velazquez sold her Cicero house in May 1996. She argues that she then moved into the basement apartment of a two-flat in Cicero owned by her aunt and uncle. Velazquez owned two properties in Berwyn, which she says were investment properties.

Defendants argue that Velazquez actually resided at one of these properties and not in the Cicero basement apartment. Her aunt and uncle did not charge her any rent to live in the basement apartment, although Velazquez testified that she "helped [her] aunt out with utilities." The basement apartment occasionally flooded. Velazquez testified that, after some of her mail was opened at the basement apartment, she had "sensitive" pieces of mail sent to one of her Berwyn properties.

As to the two Berwyn properties, defendants argue that Velazquez treated one as a primary residence and the other as an investment property. Velazquez purchased her family home in Berwyn from her parents in October 1996. As to the family home, she (1) signed a mortgage requiring her to maintain the home as her principal residence for a period of time; (2) signed a Homeowner Exemption Application certifying that the house was occupied as a principal residence by the current or previous owner on January 1, 1997 (after Velazquez purchased the property); (3) deducted the mortgage interest on her 1997 and 1998 federal tax return; (4) did not deduct the remodeling expenses on her tax returns; and (5) did not claim rental payments as income on her tax returns, even though she argues that her sister and a friend paid

5

her rent.

In 1994, Velazquez purchased an investment property in Berwyn ("the investment property"). Velazquez never lived at the investment property. On her federal tax return, she listed this property as an investment property and reported the rent collected. She did not file a Homeowner Exemption Application for the investment property.

In 1997, a dispute arose between the Town and the union as to whether charges for violations of the residency requirement were subject to grievance arbitration or Board proceedings. The union filed suit in state court, and the court held that such violations were subject to proceedings before the Board. The Town then proceeded with charges before the Board. On September 8, 1998, the Board found that Velazquez resided in Berwyn. Velazquez received pay during her suspension until she was terminated by the Board in September 1998.

After the Board issued its ruling, the Illinois Appellate Court reversed the trial court and held that Velazquez's case was subject to grievance arbitration. The Town and the union then agreed to bring the case before an arbitrator. Arbitration took place in October 2000. On February 7, 2001, the arbitrator ruled that the Town had cause to discharge Velazquez for violating the residency requirement. The arbitrator also ruled that Velazquez was not entitled to backpay for the period from the Board ruling until the arbitrator's ruling.

Velazquez alleges that she was not suspended and discharged because of her alleged violation of the residency requirement but instead because of her political affiliation and protected speech. Velazquez testified that she was critical of Loren-Maltese from 1993 until her suspension. She testified that she criticized Loren-Maltese in front of other officers on her shift about: (1) RAM Towing, apparently a company that towed vehicles for the Town and was

6

owned by Loren-Maltese; (2) the distribution of political fundraising tickets for police officers to sell; (3) Loren-Maltese's lack of education; and (4) Loren-Maltese's past profession. Velazquez's criticisms were never made in writing or broadcast on television, and she never made these criticisms directly to Loren-Maltese or to "Town officials."

In December 1995, Velazquez was given the position of detective but her salary remained unchanged. In December 1996, she testified that she went to Schullo's birthday party. Two days after attending the birthday party, Velazquez was demoted to patrol officer. Velazquez testified that David Hatton, a tactical officer with the police department, may have seen her at the party and reported back to Loren-Maltese. Velazquez's salary did not change when she was demoted to patrol officer. Velazquez testified that Deputy Superintendent Zalas told her that she would no longer be a dectective but said he did not know the reason. After being reassigned to patrol officer, one of the assignments given to Velazquez was to guard the front of Loren-Maltese's home, an assignment she found demeaning.

Velazquez testified that the Berwyn Life community newspaper published statements by Loren-Maltese that "Judith Velazquez is a corrupt police officer." Although Velazquez claimed to have copies of these articles at her deposition, she has never produced them to the Town.

On one occasion, Velazquez criticized Loren-Maltese to a television news crew, but her criticisms were never aired. Velazquez testified that Fire Lieutenant Chlada, a member of the Cicero Republican Organization, was staring at her when she was talking to the news crew and that Chlada overheard her.

In December 1996 or January 1997, a Cicero Police Sergeant Wagge who was a member of Loren-Maltese's political organization attempted to give Loren-Maltese political fundraising

7

tickets to Velazquez to sell. Velazquez refused to take the tickets, and Wagge stated: "What, can't you afford it? Why don't you just sell them to you buddy, Emil [Schullo]?"[8]

Velazquez argues that Bacon, a Loren-Maltese supporter who did not reside in Cicero, was treated more favorably. Bacon was Loren-Maltese's driver and security guard during the 1997 political campaign. In October 1997, Bacon was hired by the Cicero Police Department as Director of Internal Affairs. Bacon resided in Niles and not Cicero, a fact which Loren-Maltese knew. Defendants argue that Bacon received an exemption from the residency requirement because of safety concerns about the Director of Internal Affairs residing in the Town. When Rutka was the Director of Internal Affairs, however, he resided in Cicero.

**III.    Discussion**

    A.    <u>All Counts: Bacon</u>

Velazquez did not oppose the granting of summary judgment in favor of Bacon. Memorandum in Opposition to Rutka's Motion, at 1 n.1 ("Velazquez concedes that Bacon had no role in the adverse action taken against her."). Thus, summary judgment as to Bacon is granted on both Counts I and III.

    B.    <u>First Amendment Claim: Rutka and Loren-Maltese</u>

In Count I, Velazquez alleged that she was suspended, removed from the payroll, and ultimately discharged because of her political support for Hernandez and his opposition to Loren-Maltese. In *Spiegla v. Hull*, 371 F.3d 928, 935 (7th Cir. 2004), the Seventh Circuit articulated the approach for evaluating a § 1983 claim for retaliation in violation of First

---

[8]Defendants assert that Wagge's statements to Velazquez are hearsay. Since Wagge was a Town employee, the court will assume for the purpose of this motion that his statements are admissible under Fed. R. Evid. 801(d)(2)(D).

Amendment rights in the public employment context under *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274 (1977): (1) the court must "determine whether the employee's speech was constitutionally protected"; (2) "plaintiff must establish that the speech was a substantial or motivating factor in the retaliatory action"; (3) defendant can then "establish that the same action would have been taken in the absence of the employee's protected speech."

Defendants have not disputed that Velazquez engaged in constitutionally protected activity, and so the court assumes that defendants concede this point at least for the purpose of the motions for summary judgment.[9] Defendants argue, however, that Velazquez has not established that her political affiliation was a substantial or motivating factor in her suspension and discharge.

There are two individual defendants remaining in this case: Loren-Maltese and Rutka. For the individual defendants to be liable for retaliating against Velazquez for her political affiliation and political speech, Velazquez must show that defendants knew of it. "The protected conduct cannot be proven to motivate retaliation if there is no evidence that the defendants knew of the protected activity." *Morfin v. City of East Chicago*, 349 F.3d 989, 1005 (7th Cir. 2003) (citing *Stagman v. Ryan,* 176 F.3d 986, 1000-01 (7th Cir. 1999)) (internal quotations omitted).

Velazquez has raised disputed issues of material fact as to whether Loren-Maltese knew of Velazquez's political affiliation. Velazquez expressed criticism of Loren-Maltese to others in

---

[9]Defendants attempt to dispute whether Velazquez engaged in protected speech in their reply brief by citing for the first time Velazquez's certified public voting records showing that she voted in the Republican primary in February 1997. While this may be relevant evidence, it does not conclusively show that Velazquez did not oppose Loren-Maltese. At most, it shows that there is a disputed issue of material fact as to who Velazquez supported in the 1997 primary election.

9

the police department. Velazquez testified that a fire lieutenant saw her criticizing Loren-Maltese to a television news crew (although the story never aired). Velazquez testified that she supported Hernandez in the primary and general elections. She acted as a Democratic precinct captain, signed Hernandez's nominating petition, requested a Democratic primary ballot, and distributed Hernandez literature door-to-door. During the election, precinct captains gathered information about which voters expressed support for which political organization and then reported this information to the Town Republican Organization. Loren-Maltese also knew that there were three political factions in the Cicero Police Department: one that supported her, one that supported Hernandez, and one that supported Schullo. Velazquez refused to sell tickets to a Loren-Maltese fundraiser. Velazquez argues that a jury could infer from these facts that Loren-Maltese knew that Velazquez supported Hernandez and opposed Loren-Maltese's re-election.

While the evidence in her favor is far from conclusive, Velazquez has adequately shown that disputed questions of material fact exist as to whether Loren-Maltese knew of her political affiliation. A jury could find that Loren-Maltese knew about her political affiliation because of Loren-Maltese's position in the Town Republican Organization, because of Velazquez's outspoken criticism of Loren-Maltese, and because of Velazquez's refusal to sell Loren-Maltese fundraising tickets. The summary judgment papers are richer in suspicion than context, but a trial would likely generate enough context so Loren-Maltese's knowledge could be inferred.

As to Rutka, Velazquez argues that a jury could infer that Rutka knew of Velazquez's political affiliation because Rutka was a precinct captain in the Town Republican Organization and because of her outspoken criticisms of Loren-Maltese discussed above. While again it is a close question, the court finds that Velazquez has shown a disputed issue of material fact as to

whether Rutka knew of her political affiliation. Rutka was a precinct captain in Loren-Maltese's political organization, and because of Velazquez's outspokenness, a jury could conclude that he knew of her political opposition to Loren-Maltese.

Defendants next argue that Velazquez has not met her burden of showing that her political support for Hernandez was a substantial or motivating factor in her suspension and discharge. Hernandez avers that, after Loren-Maltese's re-election, at least 30 Cicero police officers, constituting about one-third of the department, were suspended and had charges filed against them seeking their discharge. Hernandez avers that these 30 officers were all either his or Schullo's supporters. This evidence supports an inference that Velazquez's political affiliation was a substantial or motivating factor in her suspension and discharge.

The court also notes that Velazquez has provided the court with at least one instance where a Loren-Maltese supporter, Bacon, violated the residency requirement but was not disciplined. While defendants argue that Bacon requested an exemption from the residency requirement based on his position as Directer of Internal Affairs, this nevertheless raises a disputed issue of material fact as to whether Loren-Maltese supporters were treated more favorably.[10] Thus, Velazquez has presented evidence that supports an inference that her political affiliation was a substantial or motivating factor in her suspension and discharge.

Since Velazquez has satisfied her burden to show that her political affiliation was a substantial or motivating factor in her suspension and discharge, defendants must "establish that the same action would have been taken in the absence of the employee's protected speech."

---

[10]Since a disputed issue of material fact is thus established, the court need not address Velazquez's argument that a jury could infer bad motive from defendants' failure to identify who was responsible for the actions against Velazquez.

11

*Spiegla*, 371 F.3d at 935. Defendants argue: "Significantly, and dispositively for this issue, an Arbitrator *and* the Police Board found the Town had a legitimate reason for terminating Velazquez: she violated the residency requirement." Town's Memorandum in Support of Motion for Summary Judgment, at 12 (emphasis in original). This court, however, previously held in the related case of *DeMauro v. Loren-Maltese*, 98 C 8318, that the fact that the Town had a legitimate reason for terminating the plaintiff was not dispositive on the constitutional claim. Order at 2 (Sept. 9, 2002).

Despite the existence of a legitimate reason for termination, defendants may still be liable for actions taken against Velazquez if they would not have taken those actions in the absence of her protected speech. This is a disputed issue of material fact: whether the Town's proffered reasons for suspending Velazquez – violation of the residency requirement – was the actual reason for suspending and terminating her. Velazquez has put forward evidence that charges were brought only against officers who supported Hernandez and Schullo shortly after Loren-Maltese's re-election. She has also provided at least one instance where a Loren-Maltese supporter, Bacon, violated the residency requirement but was not disciplined. Ultimately, this issue is likely to turn on the credibility of witnesses – something that this court cannot decide on summary judgment. *Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."). Summary judgment is denied as to Rutka and Loren-Maltese on Count I.[11]

---

[11] Rutka also makes an argument that he is entitled to qualified immunity as to Count I. The Seventh Circuit has articulated a two-part test to determine whether government officials are entitled to qualified immunity: "(1) does the alleged conduct set out a constitutional violation?

B.     Count I for First Amendment Retaliation: The Town

The Town argues that it should be dismissed as a defendant because Velazquez's evidence does not support municipal liability. The touchstone of a § 1983 action against a governmental body is an allegation that "official policy" is responsible for a deprivation of a right protected by the Constitution. *Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658, 694 (1978). "It is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* This requirement is meant to "distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cinncinnati,* 475 U.S. 469, 479 (1986). There are three ways in which a municipality can be held liable under § 1983. "There must be: (1) an express policy that would cause a constitutional deprivation if enforced; (2) a common practice that is so widespread and well settled as to constitute a custom or usage with the force of law even though it is not authorized by written law or express policy; or (3) an allegation that a person with final policy-making authority caused the constitutional injury." *Lawrence v. Kenosha County*, 391 F.3d 837, 844 (7th Cir. 2004) (citing *Baxter v. Vigo County Sch. Corp.,* 26 F.3d 728, 735 (7th Cir. 1994)).

---

and (2) were the constitutional standards clearly established at the time in question?" *Young v. Murphy*, 90 F.3d 1225, 1234 (7th Cir. 1996). Rutka argues only that "Velazquez suffered no constitutional violation." Rutka's Memorandum in Support, at 5. However, since the court has determined that disputed issues of material fact remain as to whether Velazquez suffered a constitutional deprivation, the court rejects Rutka's argument that he is entitled to summary judgment based on qualified immunity.

Velazquez argues that there was a widespread practice of First Amendment retaliation after Loren-Maltese's re-election. As discussed above, Velazquez has presented evidence that, shortly after Loren-Maltese's re-election, charges were brought against a significant number of officers who supported Loren-Maltese's political opponents. This is sufficient to raise a disputed issue of material fact as to whether there was a widespread practice of First Amendment retaliation against officers who supported Loren-Maltese's political opponents. The motion for summary judgment on Count I as to the Town is denied.[12]

    C.    <u>Count III for Conspiracy: All Defendants</u>

All the defendants, except the Board, have moved for summary judgment on Velazquez's conspiracy claim. In Rutka's motion for summary judgment, he makes a conclusory statement that he is entitled to summary judgment on Velazquez's conspiracy claim; yet his memorandum in support contains no specific argument as to this claim. In the Town's motion for summary judgment, it argues in a conclusory fashion that Velazquez has not alleged or proven an agreement.[13] In opposition to the motions for summary judgment, Velazquez argues that Loren-Maltese, Rutka, and others engaged in a conspiracy to rid the police department of those officers who politically opposed Loren-Maltese. In reply, defendants state only that "[i]f the Court grants summary judgment on [Velazquez's] constitutional claims, it must grant summary

---

[12]Since the court finds that Velazquez has sufficiently established a widespread practice, it need not consider her other argument, namely, that officials with "final policymaking authority" were responsible for the First Amendment retaliation against her.

[13]The Town also argues that it is entitled to summary judgment on the conspiracy claim because "Velazquez has not suffered any constitutional deprivations." Town's Memorandum in Support, at 15. Since the court has determined that disputed issues of material fact remain as to whether Velazquez suffered a constitutional deprivation, this argument is rejected.

judgment on her conspiracy claims because the latter is based on the former." Reply, at 10. Since the court has denied summary judgment on Count I as discussed above, the motion for summary judgment as to Count III for Rutka, Loren-Maltese, and the Town is also denied.

## III. Conclusion

For the foregoing reasons, defendants' motion for summary judgment is granted in part and denied in part. Summary judgment is granted in favor of Bacon on Counts I and III, and Bacon is terminated as a defendant. Summary judgment as to Rutka, Loren-Maltese, and the Town as to Counts I and III is denied. The Board did not move for summary judgment, and as such, the Board remains a defendant as to Counts I and III.

ENTER:

\_\_\_\_/s/_____
Joan B. Gottschall
United States District Judge

Dated: March 29, 2006